

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
# ENTERED
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2015**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| American Housing Foundation, | § | Case No.:  09-20232-RLJ |
| | § | |
| Debtor. | § | |
| | § | |
| ———————————————— | § | ———————————————— |
| | § | |
| The Estate of Frances Maddox through its | § | |
| Independent Executor, Robert Templeton, | § | |
| Heron Land Company, Linda Cunyus, | § | |
| Luanne Boyd, Paul King, and Robert | § | |
| Templeton, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 15-02000 |
| | § | |
| Walter O'Cheskey, as Trustee of the AHF | § | |
| Liquidating Trust, and Focus Management | § | |
| Group USA, Inc., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## **MEMORANDUM OPINION**

This "adversary proceeding" is a lawsuit that was recently filed in Potter County, Texas, and then removed here. The parties to this suit first met during the chapter 11 bankruptcy case of American Housing Foundation (**AHF**). The AHF bankruptcy case began with an involuntary bankruptcy petition filed by several parties, four of which are plaintiffs in this action—Robert Templeton, the Estate of Frances Maddox (of which Templeton is the Executor), Heron Land Company (which is controlled by Templeton[1]), and Paul King (who is Templeton's brother-in-law). Plaintiffs Linda Cunyus and Luanne Boyd are Templeton's daughters. The plaintiffs will collectively be referred to as the **Templeton Group**.

Defendant Walter O'Cheskey, Trustee of the AHF Liquidating Trust (**O'Cheskey** or **Trustee**), was the chapter 11 trustee of the AHF bankruptcy case, appointed in April 2010; defendant Focus Management Group USA, Inc. (**Focus**) is a firm that, with the Court's approval, was employed by the Trustee to assist the Trustee in administering the AHF bankruptcy case and in formulating a bankruptcy plan.

Now, five years later, the Templeton Group has sued the Trustee and Focus in state court, which suit was promptly removed by the Trustee and Focus to this Court, the home of the AHF bankruptcy case. The Templeton Group says this suit has nothing to do with the AHF bankruptcy case and thus must be sent back to Potter County, Texas. The Trustee and Focus contend it has everything to do with the AHF bankruptcy case and thus was properly removed to and should remain with this Court. The Court concludes that the suit implicates "core" bankruptcy jurisdiction and thus denies the Templeton Group's request to remand the suit to Potter County.[2]

---

[1] Heron Land Company is a Texas corporation presently owned by Templeton's daughters, but at the time of the AHF involuntary filing, Templeton was the president and owned 60% of Heron, with his daughters owning the remaining 40% [No. 09-20232, Doc. No. 1 at 3; Adv. No. 11-02133, Doc. No. 226 ¶ 54].

[2] The Court decides this matter upon the authority conferred on the Court by 28 U.S.C. §§ 1334(b) and 157 (a), (b).

# I.

The Templeton Group filed its original petition in the 108th District Court of Potter County, Texas, asserting that the state court had both personal and subject matter jurisdiction over the Trustee and Focus. The Templeton Group seeks damages that "include monetary relief in excess of $1,000,000.00." *Plaintiffs' Original Petition*, Doc. No. 1, Ex. A. ¶ 5.[3] The Trustee and Focus promptly removed the suit to this Court, asserting that jurisdiction lies here because the causes of action arise from, or are sufficiently related to, the AHF bankruptcy case to impose federal court jurisdiction. They also contend, invoking the "*Barton* doctrine," that the state court lacks jurisdiction because the Templeton Group failed to first obtain leave of court from this Court, the bankruptcy court, before suing the Trustee who was the trustee in the AHF bankruptcy case. *Notice of Removal*, Doc. No. 1 ¶¶ 20–23. Then, predictably, the Templeton Group filed its *Plaintiffs' Motion for Remand or Abstention* (**Motion**) [Doc. No. 13], disputing that this Court, as a federal court, holds jurisdiction over this suit and, even if it does, contending it is at most "related-to" jurisdiction, i.e., the charges are merely related to the AHF bankruptcy case; and if they are just related to the bankruptcy case, this Court must abstain and send the suit back to state court.

Bringing state-law causes of action in (or into) the bankruptcy court oftentimes raises challenging "jurisdictional" issues. *See, e.g., Stern v. Marshall*, 131 S. Ct. 2594, 2604, 2620 (2011) (Court held that, in light of the framework of the bankruptcy system, the bankruptcy court had statutory authority but not constitutional authority to decide a state-law based counterclaim by a debtor against a claims-filing creditor). This suit is no exception: issues abound, issues of jurisdiction under both state law and federal law, with overlapping and redundant questions of

---

[3] References to "Doc. No. __" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court. Unless otherwise indicated, the referenced docket entry number can be found in the underlying Adversary No. 15-02000.

abstention (mandatory or discretionary), removal, and remand. But the ultimate issue to decide is a basic one: must or should this action be sent back to state court?

Referring to *the bankruptcy court's* jurisdiction is a bit of a misnomer. Jurisdiction of all bankruptcy cases and associated proceedings is conferred upon the federal district courts. *See* 28 U.S.C. § 1334(a), (b). Then, by local order, all such cases and proceedings are referred to the bankruptcy courts. *See* 28 U.S.C. § 157. The statute then sets out the "division of labor"[4] between the bankruptcy court and the district court, and includes a non-exclusive list of *core* proceedings. *Id.* § 157(b)(2)(A)–(P). The bankruptcy judge can hear and decide all bankruptcy cases and all core proceedings arising in the bankruptcy case proper, *id.* § 157(b)(1); the bankruptcy judge can only hear and make proposed findings of fact and conclusions of law of *non-core* proceedings, which are matters that are merely *related to* the bankruptcy case, *id.* § 157(c). With the consent of all parties, however, the bankruptcy judge may hear and decide a non-core matter. *Id.*; *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948–49 (2015). The practical distinction between core and non-core proceedings, assuming no consent, is the level of review by the district court. If the action is defined as core—or non-core with consent—the district court, upon appeal, reviews findings of fact for clear error and conclusions of law de novo. §§ 157(c)(2) and 158(c)(2). But findings of fact and conclusions of law that are proposed in a non-core, related-to matter, *and are objected to*, are both considered de novo by the district court. § 157(c)(2).

The framework of the bankruptcy system drives the analysis of the issues raised here. As a threshold matter, determining whether the state court actions here are fundamentally core or related-to is determinative of whether this action must go back to state court. If it is core, there is no compelling reason to send it back. The Court heard the bankruptcy case and the almost endless array of suits and disputes that have come out of the AHF bankruptcy case. If the action here is

---

[4] *Stern*, 131 S. Ct. at 2620.

deemed to be a non-core proceeding, the Court must likely abstain and thus remand it back to state court.  The jurisdictional statute, § 1334, addresses mandatory abstention, stating as follows:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).  The motion here is timely; the suit is based exclusively on state-law based causes; jurisdiction would not lie in federal court but for the AHF bankruptcy; and, assuming no procedural problems, it was first brought in a state forum of appropriate jurisdiction.

Defining a matter as related to a bankruptcy case satisfies the minimal jurisdictional standard and thus invokes the circumscribed involvement of the bankruptcy court.  At first blush, it appears that the causes of action here are at least related to the AHF bankruptcy case.  After all, this is a suit by asserted creditors of AHF against the former chapter 11 trustee of AHF for his actions during the pending AHF bankruptcy case.  But do the alleged actions go to the very heart of the AHF bankruptcy case and thus "stem" from it, thereby making this a core proceeding?[5]

The Trustee and Focus argue that the suit here is core as it is both a "matter[] concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A), and a "proceeding[] affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship . . . ," 28 U.S.C. § 157(b)(2)(O).  The Templeton Group submits that the suit cannot constitute a core proceeding as it raises state law claims only and, given it was brought well after confirmation of the AHF plan, it cannot, by definition, concern a bankruptcy trustee, creditors of AHF, or property of the estate.  "A suit, such as the present one, against a trustee for post-confirmation conduct does not involve implementation of the Plan, affect liquidation of the bankruptcy estate, or adjust the debtor-

---

[5] The Supreme Court, in its landmark bankruptcy decision of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), said a constitutionally core proceeding includes one that "stems from the bankruptcy itself." *Id*. at 2618.

creditor relationship." *Brief in Support of Plaintiffs' Motion for Remand or Abstention*, Doc. No. 14, ¶ 13. Indeed, the Templeton Group submits that the bankruptcy court (or, really, the district court) has no jurisdiction in light of this suit's clear post-confirmation status.

## II.

Determining the nature of the action here first requires a review of the allegations made by the Templeton Group. The Court, as the forum for the AHF bankruptcy case, will provide the context for certain factual allegations.[6] The factual allegations supporting the charges here are set forth at Part V, paragraphs 7 through 23, of the petition. *Plaintiff's Original Petition*, Doc. No. 1, Ex. A. It begins with a brief history of AHF and its formation by Steve Sterquell in 1989 as a non-profit corporation, and how its purpose was to provide "affordable housing for working families and individuals." *Id*. ¶ 7. It then notes how AHF, through its affiliated entities, grew to operate over 65 affordable housing communities with over 13,400 units in nine different states, including Texas.

The Templeton Group's factual statement continues, beginning at paragraphs 8–10, with a description of the "AHF Collapse," "Sterquell's Death," and the "AHF Bankruptcy." As stated, the AHF bankruptcy saga began with an involuntary chapter 11 petition filed against AHF on April 21, 2009; though not mentioned in the state court petition here, the petitioning parties were *Robert L. Templeton*, Don Storseth as Trustee of the Storseth Family Trust, Dennis Dougherty, *Paul King*, *Robert L. Templeton as Trustee of the Frances Maddox Estate*, *Robert L. Templeton as President of Heron Land Company*, David N. Miller, Susan S. Miller, and Clay Storseth [No. 09-20232, Doc. No. 1].[7] AHF ultimately responded to the involuntary petition by filing a separate, *voluntary*

---

[6] The Court takes judicial notice of the matters that had previously come before the Court in connection with the AHF bankruptcy case.

[7] The following creditors were subsequently added as petitioning creditors upon orders granting their motions to join the involuntary petition: Herring Bank, Attebury Family Partnership, L.P., CC Burgess Investments, Chain-C, Inc., Campbell Burgess, Herring Financial Services, Cornelia J. Slemp Trust, Louise Johnson Thomas Trust, Vaudrey Capital, L.P., and William Scott. No. 09-20232, Doc. Nos. 36, 52, 54, 81.

petition under chapter 11 on June 11, 2009 [No. 09-20373, Doc. No. 1]. This was not an insignificant event as the issue had been raised whether AHF, as a non-profit entity, could be the subject of an involuntary petition. *See* 11 U.S.C. § 303(a) (a corporation that is not a moneyed, business, or commercial corporation may not be subject of an involuntary suit).

Paragraph 11 of the petition notes that in April 2010, one year after the bankruptcy was first filed, Walter O'Cheskey was appointed as the chapter 11 trustee. Doc No. 1, Ex. A ¶ 11. This occurred on the motion of Texas Capital Bank (**TCB**) and after a full-blown trial at which the Official Unsecured Creditors Committee (**OUCC**) and its counsel were the principal litigants opposing the appointment of a trustee. The members of the OUCC were Robert Templeton, Rainier American Investors (I, II, and III), Terrill F. Horton, and Herring Bank [No. 09-20232, Doc. No. 130]; Templeton was then the chairman of the OUCC [No. 09-20232, Doc. No. 116 ¶ 5]. Paragraph 11 then states that the Court "granted TCB's request and appointed Walter O'Cheskey . . . as the Chapter 11 Trustee." Doc. No. 1, Ex. A ¶ 11. The Court did grant TCB's request, but it *approved* the United States Trustee's appointment of O'Cheskey. Paragraph 11 recites that O'Cheskey employed Max Tarbox and the firm of Gardere Wynne Sewell, LLP (**Gardere**) as bankruptcy counsel. The Templeton Group then alleges that Gardere partner Steve McCartin served as lead counsel and, "**[o]n information and belief, from that point on, all material decisions in bankruptcy were made by Gardere, in the person of McCartin, who has, from the start and throughout the proceedings, been the *de facto* Trustee.**" *Id*. (emphasis added). It then states that "**[o]ne of McCartin's first acts was to disengage counsel for the Unsecured Creditors' Committee.**" *Id*. (emphasis added).

The remaining factual allegations, paragraphs 12 through 23, describe two related events upon which the charges are principally based. First, at paragraph 12, the Templeton Group alleges that in December 2010, McCartin, O'Cheskey, and Alan Weiner, an employee of defendant Focus,

met with agents of the Internal Revenue Service "for the purpose of discussing the business of AHF." *Id.* ¶ 12. It then alleges the following:

- that **McCartin, O'Cheskey, and Weiner informed the IRS that "innocent unsecured creditors"—obviously the plaintiffs—had participated in fraudulent tax schemes**; and

- that **the purpose of the meeting was to encourage the IRS "to take adverse action against the Trust Beneficiaries" to (1) justify the "excessive actions of the Trustee against the Trust Beneficiaries," and (2) "to bolster the claims of the Trustee**." *Id.* (emphasis added).

An additional factual allegation is made that did *not* occur at the 2010 meeting. The Templeton Group states that O'Cheskey, "[a]s late as 2012," falsely stated that plaintiff Templeton "had been audited by the IRS and was under criminal investigation." *Id.* The petition does not specify to whom this was stated.

The second, and related, event is alleged at paragraph 20 and concerns the so-called "TEFRA Audit." The TEFRA Audit is, according to the petition, "[t]he final IRS Tax Equity and Fiscal Responsibility Act ('TEFRA') audit decision in April 2013 [that] found that LIHTC Walden II Development, Ltd. ('Walden II') was a 9.9% partner of AHF Development." *Id.* ¶ 20. The Templeton Group states that the audit was done upon the request of Alan Weiner and O'Cheskey and that the 9.9% ownership finding was incorrect. They then catalog certain facts that culminate in their allegation that **O'Cheskey, as the Trustee, "intentionally secreted the [audit] from the Trust Beneficiaries to prevent them from challenging the [incorrect finding of the 9.9% ownership] and to justify his actions against them**." *Id.* (emphasis added). They submit that O'Cheskey and Weiner, given their respective levels of experience, should have known of the need to pass-along the audit error to "indirect limited partners" of Walden II and that, beyond the duty to disclose, they had an ultimate duty to contest the false finding. *Id.* ¶ 21. This damaged the Templeton Group, they allege, as they were unable to timely contest the incorrect audit finding that,

presumably, resulted in the IRS's conclusion that tax deductions taken by the Templeton Group were improper.  They state that plaintiff Boyd's tax deficiency was determined to be $33,165.10; that plaintiff Cunyus's tax deficiency was determined to be $55,168.20; that plaintiff Estate of Frances Maddox was assessed a tax deficiency of approximately $150,000; that plaintiff Templeton was assessed a tax deficiency of approximately $640,000; and that plaintiff King was assessed a tax deficiency of $83,000.  *Id.* ¶ 22.

Their final factual allegation is made at paragraph 23 and states that "[i]f Plaintiffs knew of the [incorrect audit], they could and would have contested the findings, which would almost certainly have resulted in the finding that Walden II was never a partner in AHF Development."  *Id.* ¶ 23.[8]

Paragraphs 13 through 17 simply recite factual matters that establish the Templeton Group's standing to bring this suit—confirmation of the AHF chapter 11 plan on December 8, 2010, its creation of a liquidating trust with a trust agreement for the purpose of liquidating the estate assets and making distributions to valid creditors of AHF, and the naming of O'Cheskey as the liquidating trustee.  It then states that the plaintiffs are "Trust Beneficiaries" of the liquidating trust.  *Id.* Paragraph 18 states that as a liquidating trustee, O'Cheskey had certain duties under the trust agreement, including a duty to exercise ordinary care and diligence, and fiduciary duties to act in good faith, to deal fairly, and to remain loyal.  Expanding on such duties, the Templeton Group states that "O'Cheskey . . . has the fiduciary duty to keep the Trust Beneficiaries fully informed of his dealings regarding the Trust, and he has a duty to disclose relevant information to the beneficiaries."  *Id.* ¶ 18.  Then, at paragraph 19, the Templeton Group states that "**[a]lthough O'Cheskey transitioned from bankruptcy trustee to liquidating trustee, upon information and**

---

[8] The petition is not clear on how correcting the audit to provide that Walden II was *not* a partner in AHF Development would validate the deductions taken by Boyd, Cunyus, the Estate of Frances Maddox, Templeton, and King.

**belief, complete actual control by Gardere never changed**." *Id.* ¶ 19 (emphasis added). The petition notes that *Gardere* filed 114 adversary proceedings in April 2011 and 22 more in June 2011 and later. *Id.*

Part VI of the petition addresses the titled causes of action and thus the legal theories upon which the claims are based. The causes are set forth at paragraphs 24 and continuing through paragraph 42. As previously stated, the Templeton Group's legal theories are breach of duty of ordinary care and diligence, improper delegation of trustee's duties and failure to supervise, breach of fiduciary duties, and negligence and gross negligence; the Templeton Group also seeks an accounting.

The Templeton Group submits that the Trustee and Focus breached their respective duties of ordinary care and diligence by failing to give notice of the TEFRA Audit and that, in doing so, **they "either actively intended to harm or at the very least were indifferent toward the very people they were obligated to protect**." *Id.* ¶ 26 (emphasis added). As a result, they, the members of the Templeton Group, were prevented from contesting the audit.

Paragraphs 28 through 32 concern allegations of the Trustee's improper delegation of trust duties and his failure to sufficiently supervise his agents. The Templeton Group adds an additional factual item: they state that, "[s]ince the effective date of the Liquidating Trust, O'Cheskey has distributed over $17.4 million in administrative payments from the Liquidating Trust, including over eight million dollars in attorneys' fees." *Id.* ¶ 31. They then state that "Gardere filed 114 separate law suits or adversary actions on behalf of the Liquidating Trust." *Id.* ¶ 32. These filings, they contend, **"occurred with no supervision, no decision-making, and no exercise of the obligations of a trustee by O'Cheskey**." *Id.* (emphasis added). The Templeton Group contends that **the Trustee's "failure to act as a trustee" resulted in millions of dollars of attorneys' fees siphoned out of the liquidating trust estate**. *Id.* (emphasis added). As a result, "the Trust

Beneficiaries will be paid significantly less than if the Liquidating Trust has [*sic*] simply distributed the funds." *Id.*

A generous reading of the Templeton Group's allegations of the Trustee's breaches of fiduciary duties is as follows:

- that the **Trustee failed in his duties "to preserve assets"; "to fully disclose all material facts . . . that might affect the beneficiaries' rights"; to properly "manage, supervise, and safeguard trust funds"; and "to manage assets as a prudent investor would";**

- that the **Trustee failed to "fully disclose all material facts known to the trustee . . . by failing to disclose the relationships between the Liquidating Trustee's counsel and Related Parties";**[9]

- that the **Trustee failed to manage, supervise, safeguard, and preserve "trust assets and funds by paying out considerably more in administrative payments than the Liquidating Trust gained in benefit from administrative services and through filing numerous unnecessary adversary proceedings"; and**

- that **by engaging in a scheme to prompt the TEFRA Audit and then refusing to contest the findings, the Trustee, "intentionally or recklessly," failed to give notice of the audit to trust beneficiaries**. *Id.* ¶¶ 34–35 (emphasis added).

Paragraphs 36 through 38 allege that the Trustee was negligent (or grossly negligent) by "failing to supervise the administration of the Liquidating Trust, including the actions of his counsel, and neglecting to attend to obligations . . . requiring the exercise of discretion." *Id.* ¶ 38.

The specific damage allegations, paragraphs 40 through 42, state that each of the Templeton Group members was injured by the additional tax liabilities resulting from the TEFRA Audit and by the Trustee's incurrence of "unnecessary and excessive expenses." *Id.* ¶ 40. The damages include "any loss or depreciation in value of the trust estate" and the loss of profit "that would have accrued to the trust estate if there had been no breach of trust." *Id.* ¶ 40.

---

[9] "Related Parties" is not defined in the petition.

The Templeton Group submits that it is entitled to exemplary damages because of the Trustee's "intentional, reckless or wanton" breaches, as well as for gross negligence. *Id.* ¶ 41. They also seek an accounting and a forfeiture of all fees collected by the Trustee, both in accordance with the Texas Property Code.

## III.

## A.

The Templeton Group argues that jurisdiction, either core or non-core, cannot apply here because this suit concerns the Trustee's "post-confirmation conduct [and thus] does not involve implementation of the [AHF] Plan, affect liquidation of the bankruptcy estate, or adjust the debtor-creditor relationship." *Brief in Support of Plaintiffs' Motion for Remand or Abstention*, Doc. No. 14, ¶ 13. They submit, therefore, that the wholly post-confirmation status means this suit cannot concern a bankruptcy trustee, a bankruptcy estate, or bankruptcy professionals. This contention is conveniently made as they filed this action well after confirmation of the AHF plan and seek recovery against parties, O'Cheskey and Focus, that are no longer serving as professionals of the AHF bankruptcy case. But characterizing this suit as one based on post-confirmation conduct is simply misleading. As pleaded, the actionable conduct of the Trustee and Focus is rooted in the pre-confirmation past.

The factual allegations concern conduct that falls into two categories: first, conduct that the Trustee engaged in that was intended to bolster the claims he had, *as the chapter 11 trustee*, against AHF investors, including, obviously, certain members of the Templeton Group; second, the alleged failure, whether intentional or not, by the Trustee to perform the duties and obligations imposed on him as the bankruptcy trustee and then as the liquidating trustee. The Trustee's conduct at the December 2010 meeting with the IRS that led to the TEFRA Audit two years later and the subsequent failure to take certain actions in connection with the audit fall within the first category.

The factual allegations that fall under the second category concern the charge that the Trustee in effect allowed the Gardere firm, and in particular, lead counsel Steve McCartin, to serve as a "de facto" trustee from the outset of the Trustee's appointment, and, relatedly, the charge that the Trustee failed to properly manage and supervise his attorneys thereby allowing the Gardere firm to file over 100 adversary proceedings against "innocent" investors. The resulting administrative expenses thus diminished the estate and its profits that could have gone to the investors. The Templeton Group contends that the Trustee's misdeeds in both categories may have been negligent, grossly negligent, reckless, or even wanton.

For the Templeton Group's first cause of action for breach of duties of ordinary care and diligence, specific mention is made of the Trustee's failure to provide notice of the TEFRA Audit and that such failure resulted from either indifference or an intentional desire to do harm. The Templeton Group's second cause of action for improper delegation of duties and failure to supervise refers to the Trustee having paid over $17 million in administrative fees and $8 million in attorneys' fees caused by actions of and decisions made by the Gardere firm, specifically the filing of 114 lawsuits. The third cause of action for the Trustee's breach of fiduciary duties makes specific reference to the Trustee's failure to preserve assets, to disclose material facts, and to properly manage or supervise those working for him; the Trustee's failure to safeguard trust assets; and the Trustee engaging in a scheme to prompt the TEFRA Audit and then failing to provide notice of the audit. An additional fact is alleged in the petition under the cause for breach of fiduciary duties that references a failure to disclose relationships between counsel and related parties. The petition does not provide further explanation for this factual allegation, however. The fourth cause of action for negligence or gross negligence makes specific reference to the Trustee's failure to supervise.

Though the factual allegations made here are mostly conclusory, similar charges resonated throughout the pendency of the AHF bankruptcy case. Templeton and others of the Templeton Group opposed the appointment of a chapter 11 trustee and, upon such appointment, opposed the employment of the Gardere firm as counsel for the Trustee; they then opposed the Trustee's efforts in presenting a chapter 11 plan; they objected to fee applications of Gardere and the Trustee; and they sought a revocation of the confirmed plan. In each instance, many of their objections are the same as those that form the basis of the suit here. And, in the same vein, they also accuse the Trustee of intentionally targeting them, particularly Templeton, whom the Trustee had sued during the pendency of the bankruptcy case. **Attached to this memorandum opinion is an Addendum of quoted objections made by Templeton, and others of the Templeton Group, that presage the charges here.**

## B.

AHF was a non-profit corporation created in 1989 by its principal, Steve Sterquell, for the ostensible purpose of providing affordable housing for working families and individuals. Despite its non-profit status, AHF engaged in various financing arrangements; this included raising capital from investors on terms that were absurdly favorable to the investors. As described by the Templeton Group here, the AHF enterprise grew to the point that it owned and operated, through affiliated entities, sixty-six housing apartment communities with over 13,400 units in nine states, including Texas. Then, upon Sterquell's death in April 2009, reportedly by suicide, suspicions of AHF's financial demise (and, in particular, concerns about the status of over $25 million in company-owned life insurance (on Sterquell's life)) triggered the involuntary filing against AHF on April 21, 2009 [No. 09-20232, Doc. No. 1]. AHF filed a voluntary petition for relief under chapter 11 on June 11, 2009 [No. 09-20373]. The Court consolidated the voluntary case into the involuntary case on July 17, 2009 [No. 09-20232, Doc. No. 88].

The Plan

The confirmation of the AHF chapter 11 case on December 8, 2010, was the culminating event in the case. The confirmed plan and its provisions are implicated by this suit. The plan provided for an orderly liquidation of the assets of AHF. It accomplished this by maintaining a "Reorganized AHF" and creating the Liquidating Trust. *See Second Amended Joint Chapter 11 Plan filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [No. 09-20232, Doc. No. 1909] (the **Plan**) §§ 6.01–6.02; 7.01–7.02. The role of the Liquidating Trust was to serve as the vehicle through which certain assets (causes of action) were to be liquidated and allowed claims paid. Plan § 7.02. The "Trust Assets" consisted of "Estate Property," defined as "all rights, title, and interest in and to any property of every kind or nature owned by [AHF] or its Estate as of the Effective Date," with a few exceptions. *Id.* at 54, 60. The Reorganized AHF retained the assets not transferred to the Liquidating Trust, certain of the actual real estate properties—mostly apartment complexes—that provided the "affordable housing." *Id.* § 6.02. Its purpose was to continue their operations, stabilize them, and sell them as a going concern over the two-year period following confirmation of the Plan. *Id.*

O'Cheskey was appointed as the Liquidating Trustee and had the responsibility of administering the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.[10] *Id.* §§ 7.06, 7.08. His powers and duties as Liquidating Trustee include the "power to prosecute all Causes of Actions in the name of the Liquidating Trust or, as necessary, in the name of the Debtor," and the duty to "administer the Liquidating Trust and the Trust Assets and make Distributions in accordance with the Plan and the Liquidating Trust Agreement." *Id.* § 7.08. The Plan also appointed Alan Weiner of Focus as the president and CEO of the Reorganized AHF. *Id.*

---

[10] The Liquidating Trust Agreement attached to the Plan as Exhibit C is "substantially similar to" *the* Liquidating Trust Agreement. Plan § 7.01.

§ 6.06.  Weiner was responsible for "administering the Plan on behalf of Reorganized AHF, including, without limitation, taking all appropriate actions to transfer the Trust Assets to the Liquidating Trust, and managing the future operations of Reorganized AHF."  *Id.*

As is common with chapter 11 plans, the AHF Plan, at Article XII, provided for the retention of bankruptcy jurisdiction and the continued exercise of such jurisdiction by the Court. The Plan states that the "Bankruptcy Court . . . retain[s] the fullest and most extensive jurisdiction as is legally permissible . . . , including, without limitation, under sections 105(a) and 1142 of the Bankruptcy Code, including that which is necessary to ensure that the purpose and intent of the Plan are carried out . . . ."  Plan § 12.01.  Additional provisions provide that this Court, the bankruptcy court, retains jurisdiction after the confirmation date to determine causes of action on all disputes, "whether or not subject to any pending action, as of the Confirmation Date, for the Debtor, the Reorganized Debtor, or the Liquidating Trustee to recover assets pursuant to the provisions of the Bankruptcy Code."  *Id*. § 12.03.  The Plan provides that the Bankruptcy Court shall consider and decide applications for fees and expenses that are brought in accordance with the Bankruptcy Code; hear and decide all causes of action "arising during the period from the [p]etition [d]ate through the Effective Date and in any way related to the Plan or the transactions contemplated hereby and against" the debtor AHF, the AHF estate, the chapter 11 trustee, and their officers, attorneys, financial advisors, and agents; "hear and determine any litigation" or action against AHF, its estate, the Plan proponents, the reorganized debtor, or the liquidating trustee; and hear and determine any disputes or litigation regarding the Liquidating Trust Agreement.  *Id*. § 12.04.

The Plan contained many provisions reserving jurisdiction for certain types of disputes. Many of these provisions were negotiated by the OUCC with the intent that the Court continue its supervisory role during the post-confirmation period.  As a starting point, the Plan provides that the Liquidating Trustee derives his powers and duties from, and is governed by, both the Plan *and* the

Liquidating Trust Agreement. *Id.* § 7.05. In addition to the Plan's Retention of Jurisdiction provisions at Article XII, the Plan reserved the Court's jurisdiction to hear and determine the following matters:

- The approval or denial of professional fee claims and objections to the professional fee claims. *Id.* § 2.02.

- The determination of whether to allow the Liquidating Trust to file objections to claims or adversary complaints and the authority to extend the time to file objections to claims. *Id.* § 10.02.

- The removal of the President upon a finding, by clear and convincing evidence and after notice and hearing, of gross negligence or willful misconduct. *Id.* § 6.06.

- The supervision of the Liquidating Trustee in the fulfillment of his duties pursuant to the Liquidating Trust Agreement. *Id.* § 7.08.

- The appointment of a successor Liquidating Trustee after notice and hearing. *Id.* § 7.05.

- The approval of payment of objected-to fee claims by the Liquidating Trustee's professionals after notice and hearing. *Id.* § 7.18.

- The estimation or limitation of any contingent, unliquidated, or disputed claims. *Id.* § 10.10(c).

- The approval of interim distributions by the Liquidating Trustee. *Id*. § 10.11(e).

The Plan also provided for the following: § 6.04 (approval of subsequent members of the Reorganized AHF Board), § 6.06 (approval of successor president of Reorganized AHF), § 6.07(a)(1) (authority to decide the terms of Focus's engagement with the Reorganized AHF if Focus and the Board cannot agree on the terms), § 6.07(a)(3) (authority to decide the terms of Gardere's engagement with the Reorganized AHF if Gardere and the Board cannot agree on the terms), § 6.17 (authority to decide when and if the Reorganized AHF should be dissolved if the President and Board cannot decide).

The Plan also required the Liquidating Trustee and the President of Reorganized AHF to keep the Court informed of the status of the liquidation by providing for the following:

- The filing of a quarterly report by the Liquidating Trustee showing record of the receipts, disbursements, and reserves of the Trust.  *Id.* § 7.10.

- The filing of a report by the reorganized debtor of the calendar year's accounting of excess revenue, proposed budgets, and proposed-to-actual budget reports.  *Id.* § 6.12.

- Disputes arising between the Trust Oversight Committee[11] and the reorganized debtor over the reports to be filed with the Court pertaining to excess revenue, proposed budgets, and proposed-to-actual budget.  *Id.*

- The filing of a quarterly report by the reorganized debtor showing its assets and liabilities, any changes in its assets, and any material actions taken.  *Id.*

Furthermore, the Liquidating Trust Agreement[12] contained jurisdiction retention provisions for removal of the Liquidating Trustee and the appointment of a successor.  Liquidating Trust Agreement §§ 8.2–8.4.  It also contained a general provision stating:

> The Bankruptcy Court shall retain original but not exclusive jurisdiction over the Causes of Action and counterclaims, the Liquidating Trust, the Liquidating Trustee, and the *Trust Assets*, including, without limitation, the *determination of all controversies and disputes arising under or in connection with this Trust Agreement*.

*Id.* § 10.1 (emphasis added).

Indemnity Provisions of Plan and Liquidating Trust Agreement

Both the Plan and the attached Liquidating Trust Agreement contain provisions that indemnify the Trustee and are likely applicable in light of the claims made here.

Section 9.09 of the Plan provides for indemnification of the Chapter 11 Trustee and his professionals:

---

[11] The Trust Oversight Committee is a four-member committee tasked with monitoring the actions of the Liquidating Trustee.  Liquidating Trust Agreement § 1.19.  "The Trust Oversight Committee [is] authorized to review, consult with on not less than a quarterly basis, and advise the Liquidating Trustee in connection with any matters relating to Liquidating Trustee, including litigation, compromises of litigation, and various causes of action and distributions."  *Id.*

[12] *See supra* note 10.

> Neither the Chapter 11 Trustee, his Professionals, the Creditors Committee, its Professionals, nor the Creditors Committee's members (solely in their capacity as members of the Creditors Committee) will have or incur any liability to any holder of a Claim or any other entity for any act or omission in connection with, or arising out of, the formulation, preparation, dissemination, approval, confirmation, administration, or consummation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan or consummation or administration of the Plan or Distributions under the Plan, except for willful misconduct or gross negligence. The foregoing parties will be entitled to rely on the advice of counsel in all respects regarding their duties and responsibilities under the Plan.

Plan § 9.09.

Section 8.7 of the Liquidating Trust Agreement provides for indemnification of the

Liquidating Trustee:

> The Liquidating Trustee shall perform the duties and obligations imposed on the Liquidating Trustee by this Trust Agreement with reasonable diligence and care under the circumstances. Along with his agents and representatives, the Liquidating Trustee shall not be personally liable, however, to the Liquidating Trust or to any Liquidating Trust Beneficiary except for their own acts that are judicially determined to be fraudulent or willful misconduct or gross negligence. Except as aforesaid, the Liquidating Trustee shall be defended, held harmless, and indemnified from time to time from the Trust Assets as a Trust Administrative Expense against any and all losses, claims, costs, expenses, and liabilities (including legal costs and expenses), and any costs of defending any action to which the Liquidating Trustee may be subject by reason of the Liquidating Trustee's execution in good faith of his duties under this Trust Agreement. The Liquidating Trustee's agents and representatives may be likewise defended, held harmless, and indemnified. The Liquidating Trustee may obtain for his benefit, the benefit of his agents and representatives, and the benefit of the Liquidating Trust, at the expense of the Liquidating Trust, as a Trust Administrative Expense, insurance against claims of liability, damage awards, and settlement.

Liquidating Trust Agreement § 8.7. Article IV of the Liquidating Trust Agreement provides further

indemnification:

> Third parties dealing with the Liquidating Trust shall look only to the Trust Assets to satisfy any liability incurred by the Liquidating Trust or the Liquidating Trustee to such parties. Neither the Liquidating Trustee nor any Liquidating Trust Beneficiary shall be individually or personally liable to any third party for any expense, claim, damage, loss, obligation, or liability of or incurred by the Liquidating Trust or incurred in connection with the administration of the Liquidating Trust or by reason of this Trust Agreement or any action taken hereunder or as a result hereof.
> . . . .

> The Liquidating Trustee, each Liquidating Trust Beneficiary, and each member of the Trust Oversight Committee shall be entitled to be indemnified by and receive reimbursement from the Trust Assets for any expense, claim, damage, loss, obligation, or liability of or to which any Liquidating Trust Beneficiary may be subject by reason of this Trust Agreement or any action taken hereunder or as a result hereof.

*Id.* § 4.1.

Section 6.07 of the Plan provides for indemnification of Alan Weiner as the president of

Reorganized AHF:

> [T]he President shall be indemnified by and receive reimbursement against and from any and all loss, liability, expense, or damage that the President may incur or sustain, in good faith and without fraud, willful misconduct, or gross negligence, in the exercise and performance of any of the President's powers and duties under the Plan. The amounts necessary for all such compensation, indemnification, and reimbursement and for all expenses of administration, including, without limitation, legal fees, shall be withdrawn by the President from the Assets.

Plan § 6.07.

Templeton Group's Proofs of Claim and their Disposition

Members of the Templeton Group were claims-filing claimants in the AHF bankruptcy case.

Their claims, however, have been effectively subordinated to allowed claimants upon objections

and trials before the Court.

Templeton filed an original proof of claim on October 5, 2009, designated as Claim No. 76-

1 on the Bankruptcy Clerk's claims register in Case No. 09-20232; his amended claim [Claim No.

76-5] was filed on October 7, 2011, in the amount of $4,746,520.11, and is based on five separate

investments made by Templeton.  The Trustee initiated a complaint against Templeton seeking to,

among other things, subordinate his claim to the allowed claims of "legitimate general unsecured

creditors."  Adv. No. 10-02016, Doc. No. 52 ¶ 62.  After conducting a trial on the complaint, the

Court subordinated Templeton's claim to all allowed general unsecured claims pursuant to the provisions of 11 U.S.C. § 510(b). *Judgment* [Adv. No. 10-02016, Doc. No. 303].[13]

The Frances Maddox Estate filed an original proof of claim on October 6, 2009, designated as Claim No. 84-1 on the Bankruptcy Clerk's claims register in Case No. 09-20232; an amended claim [Claim No. 84-2] was filed on November 19, 2010, in the amount of $1,022,875.71. Heron Land Company filed an original proof of claim on October 5, 2009, designated as Claim No. 77-1; an amended claim [Claim No. 77-3] was filed on November 18, 2010, in the amount of $706,448.06. Paul King filed an original proof of claim on October 5, 2009, designated as Claim No. 78-1; an amended claim [Claim No. 78-3] was filed on November 18, 2010, in the amount of $302,765.86. The Trustee initiated a complaint against the Maddox Estate, Heron Land Company, and King seeking to, among other things, subordinate their claims[14] under 11 U.S.C. § 510(b) to the allowed claims of "legitimate general unsecured creditors." Adv. No. 11-02133, Doc. No. 70 ¶ 49. Their claims were based on their respective investments in LIHTC Walden II Development, Ltd. (Walden II). After conducting a trial on the complaint, the Court found that to the extent their claims were filed as liquidated claims based on their respective investments in Walden II, the Walden II partnership agreement, and the guaranties of AHF, such claims were recharacterized as equity investments and therefore do not share in disbursements made from the AHF Liquidating Trust; the Court also subordinated their fraud-based and other claims under § 510(b) as arising from their equity investments in Walden II. *Judgment* [Adv. No. 11-02133, Doc. No. 238].

---

[13] Although this judgment was appealed to the Fifth Circuit and ultimately remanded to this Court for further proceedings, the Fifth Circuit affirmed subordination of Templeton's claim under 11 U.S.C. § 510(b). *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 153 (5th Cir. 2015).

[14] A portion of Maddox Estate's claim was based on a $500,000 loan from the Maddox Estate to AHF; the Trustee did not object to this portion of the claim and it is therefore an allowed claim. Adv. No. 11-02133, Doc. No. 226, Finding 62.

The remaining members of the Templeton Group, Linda Cunyus and Luanne Boyd, did not file proofs of claim in the AHF bankruptcy case.

## IV.

## A.

Abstention and Remand

Under 28 U.S.C. § 1334(c)(2), the mandatory abstention provision, the Court is required to abstain if (1) the action is non-core, (2) there is no independent basis for federal jurisdiction other than § 1334(b), and (3) the action was commenced and can be timely adjudicated in the state forum. *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1206 (5th Cir. 1996). Even if the matter is core, the Court may abstain under § 1334(c)(1) if doing so is in the "interest of justice, or in the interest of comity with State courts or respect for State law." *Id.* (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987)). The Court may also remand the action on any equitable ground, or *must* remand the action if "at any time before final judgment it appears that the [Court] lacks subject matter jurisdiction." 28 U.S.C. §§ 1447(c); 1452(b).

In addition to their argument that there is no bankruptcy jurisdiction here, the Templeton Group submits alternatively that if jurisdiction does lie, it is, at most, related-to (non-core) jurisdiction that requires mandatory abstention; and, again alternatively, if core jurisdiction does exist, permissive abstention and remand are needed.

Bankruptcy Jurisdiction

To reiterate, jurisdiction over bankruptcy cases and proceedings is conferred on federal district courts under 28 U.S.C. § 1334. *Wood*, 825 F.2d at 92; *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 303 (5th Cir. 2002); *Coho Oil & Gas, Inc. v. Finley Resources, Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004). Section 1334(b) gives district courts "original but not exclusive jurisdiction" over "arising" and

"related to" civil proceedings under title 11. 28 U.S.C. § 1334(b). Such proceedings are then assigned to bankruptcy courts under § 157. 28 U.S.C. § 157. As jurisdiction extends to "arising" and "related to" matters, "it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." *U.S. Brass*, 301 F.3d at 304 (quoting *Wood*, 825 F.2d at 93)). A proceeding is "related to" the bankruptcy case when its outcome "could *conceivably* have any effect on the estate being administered in bankruptcy." *Id*. (emphasis in original). The Court, as the bankruptcy court, has the responsibility to determine whether a matter before it is core or non-core. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2171 (2014).

Post-Confirmation Jurisdiction

Bankruptcy jurisdiction, as exercised by the bankruptcy court as proxy for the district court, is more limited after the confirmation of a chapter 11 plan. It is widely recognized that while the bankruptcy case is pending, the bankruptcy court has broad authority over matters that affect the bankruptcy estate. *See U.S. Brass*, 301 F.3d at 304; *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001). But once a plan is confirmed, "the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig Stores*, 266 F.3d at 390 (citing *In re Fairfield Comtys., Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993)); *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 164–65 (3d Cir. 2004) ("After confirmation of a reorganization plan, retention of bankruptcy jurisdiction may be problematic." (citations omitted)).[15] That the bankruptcy estate morphs into a trust in the

---

[15] The Court notes that the distinction between pre- and post-confirmation conduct is not delineated by § 1334(b). *See U.S. Brass*, 301 F.3d at 304 n.25 ("Our authority to engraft limitations on § 1334 is subject to debate." (citations omitted)); *De Montaigu v. Ginther (In re Ginther Trusts)*, No. 98-3263, 2006 WL 3805670, *11 (Bankr. S.D. Tex. Dec. 22, 2006). Rather, this new "exacting theory" emerged "[b]ecause it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases." *Craig's Stores*, 266 F.3d at 391. In *Craig's Stores*, the Fifth Circuit reasoned that in the post-confirmation setting, "[n]o longer is expansive bankruptcy court jurisdiction required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id*. at 390. The AHF Plan, as noted, is a liquidating plan that effectively mimics a chapter 7 bankruptcy case.

post-confirmation setting does not preclude a finding of post-confirmation jurisdiction, however. *See Resorts Int'l*, 372 F.3d at 165; *Kaye v. Dupree (In re Avado Brands, Inc.)*, 358 B.R. 868, 878 (Bankr. N.D. Tex. 2006).

The analysis of post-confirmation jurisdiction begins with the *Craig's Stores* decision. 266 F.3d 388. In *Craig's Stores*, the debtor sued its collection agent in the bankruptcy court for breach of contract over conduct that occurred post-confirmation. *Id.* at 389. The court held that the bankruptcy court improperly exercised post-confirmation jurisdiction; it noted that though the contract at issue "existed throughout the reorganization and was, by implication, assumed as part of the plan [was] of no special significance." *Id.* at 391. The court noted that "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization." *Id.*

A year after rejecting post-confirmation jurisdiction in *Craig's Stores*, the Fifth Circuit found that post-confirmation jurisdiction existed in *U.S. Brass*. 301 F.3d at 304–05. In *U.S. Brass,* a confirmed chapter 11 plan required that the claims of certain creditors be resolved by litigation "in a court of competent jurisdiction and determined by settlement or final judgment." *Id.* at 302 (footnote omitted). The debtor later filed a motion seeking approval of an "agreement" that provided for the liquidation of certain claims by binding arbitration. An objection was lodged on the basis that the agreement was an improper modification of a substantially consummated plan. *Id.* at 302, 305. The bankruptcy court agreed and denied the motion; it held that the settlement did not really settle anything and that it improperly altered the plan. *Id.* at 302–03. On appeal before the Fifth Circuit, the Circuit reviewed the issue of the bankruptcy court's jurisdiction of the matter. The court held that post-confirmation jurisdiction existed because "[b]ankruptcy law will ultimately determine this dispute, and the outcome could affect the parties' post-confirmation rights and responsibilities." *Id.* at 305. The court added that such proceeding will impact compliance with or completion of the reorganization plan. *Id.*

The court in *In re WRT Energy Corp.* construed the post-confirmation, jurisdictional standard set forth in *Craig's Stores* as measuring "whether the matter bears a close nexus to the confirmed plan."  402 B.R. 717, 724 (Bankr. W.D. La. 2007).  To make this jurisdictional determination, the *WRT* court weighed the following factors: (1) when the claim arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state or bankruptcy law applies; (6) whether the claims require the interpretation of the plan or the court's orders; and (7) evidence of forum shopping.  *Id.* (citing *In re Encompass Servs. Corp.*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006); *Avado Brands*, 358 B.R. at 878); *see also Resorts Int'l*, 372 F.3d at 168–69 ("[W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.").  Considering the *WRT* factors, the nexus test favors bankruptcy jurisdiction.

(a)  <u>Whether the claim or dispute arose before or after confirmation</u>

The Templeton Group argues that bankruptcy jurisdiction fails here because the causes concern post-confirmation conduct.  The Trustee and Focus obviously disagree, noting that the suit is based, in part, on pre-confirmation conduct; invokes the Plan, which is *not* fully consummated; attacks several orders of the Court; and involves parties that were, and still are, integrally associated with the Plan and the Liquidating Trust created under the Plan.

As described at III A above, the conduct complained of is rooted in the timeframe prior to plan confirmation.  The charge that Gardere (through McCartin) was, in effect, a "*de facto* trustee" goes to the heart of the Trustee's alleged abdication of his duties and obligations.  And this all occurred "from the start and throughout the proceedings."  Doc. No. 1, Ex. A. ¶ 11.  The alleged

scheme to prompt a TEFRA audit by the IRS against creditors cannot have started post-confirmation, as the December 2010 secret meeting between the defendants and the IRS agents took place prior to the effective date of the Plan.  And using such meeting to discredit investors had to have been part of a plan hatched well prior to December 2010.  Among the breaches complained of by the Templeton Group is the failure to supervise and delegate duties.  The Templeton Group notes that Gardere filed over 120 actions post-confirmation, yet it fails to mention that prior to confirmation, Gardere, then representing O'Cheskey in his role as bankruptcy trustee, filed similar actions, including, notably, the action against Templeton.  No. 09-20232, Doc. Nos. 1544, 1546, 1573, 1603.  Though the suit here was recently *filed* and though it raises state law counts only, the alleged conduct that, as pleaded, supports the actions brought here is the same as the alleged conduct complained of from the appointment of O'Cheskey as the chapter 11 trustee in April 2010.

The Templeton Group cannot isolate the events by drawing a bright line on the date of confirmation and contend that the focus lies on the post-confirmation events.  At best, conduct complained of by the Templeton Group began during the AHF bankruptcy proceedings and was ultimately effected after confirmation.  Drafting the pleading to sue O'Cheskey in his role as *Liquidating Trustee* of the Liquidating Trust does not change this fact.  The Liquidating Trust was created as a means to carry-out the administration and orderly liquidation of the bankruptcy estate assets.  The facts as alleged emerge from pre-confirmation conduct.  This factor favors bankruptcy jurisdiction.

(b)  Nature of the parties involved in the dispute

As stated at the outset, the parties first met during the AHF bankruptcy; they cannot be said to be strangers to the underlying bankruptcy case and its related proceedings.  Members of the Templeton Group were claimants in the AHF bankruptcy case; the Trustee and Focus were estate fiduciaries.  Templeton participated from the outset of the case and in various roles—as a

petitioning party creditor, an asserted investor and unsecured creditor, as a member and chairman of the OUCC, and as attorney for King. O'Cheskey was bankruptcy trustee, the Plan proponent (with the OUCC), and later, Liquidating Trustee under the Liquidating Trust created by the Plan. Focus was involved from the beginning, well prior to confirmation, as a court appointed professional. This factor favors jurisdiction.

(c) <u>What provisions exist in the confirmed plan for resolving disputes and are there provisions in the plan retaining jurisdiction for trying these suits</u>

This factor clearly supports bankruptcy jurisdiction. As catalogued above, the Plan contains extensive provisions for the resolution of disputes and specifically provides that suits against creditors and suits against the Trustee or other fiduciaries must be brought before the Court. And beyond the resolution of discrete disputes or suits, the Plan provides for the ongoing oversight and supervision of the Trustee and the Liquidating Trust. From a larger perspective, the very concept of the Plan supports jurisdiction. As explained, the Plan provides for an orderly liquidation of the AHF estate, with all causes of action—in particular, chapter 5 (of the Bankruptcy Code) actions asserting fraudulent transfers, preferences, and subordination of claims—preserved and pursued in the bankruptcy court. In this regard, the Plan is not a "reorganization" plan; instead, as a liquidating plan, it established a mechanism and procedures for the orderly liquidation. And, importantly, the Plan was a *joint* plan between the Trustee and the OUCC, with which the Templeton Group was aligned at the time.

The Templeton Group contends that the inclusion of jurisdiction-retention provisions in the Plan cannot expand the Court's jurisdiction. The Court agrees; such provisions neither create nor enlarge jurisdiction at the expense of the express provisions of 28 U.S.C. § 1334(b). *Resorts Int'l*, 372 F.3d at 161 ("[N]either the bankruptcy court nor the parties can write their own jurisdictional ticket."); *U.S. Brass*, 301 F.3d at 303. But the existence of such provisions, coupled with the fact

that such provisions were critical parts of the Plan negotiation process, is telling of the parties' intent to keep those matters within the purview of the bankruptcy court. *See Fruehauf Trailer*, 369 B.R. at 827. As such, it is a *factor* that favors jurisdiction.

      (d) <u>Whether the claims require the interpretation of the plan or the court's orders</u>

The Templeton Group submits that the Trustee's improper delegation of his duties and his failure to supervise his agents (presumably the Gardere firm) caused the Trust to expend in excess of $17 million for administrative expenses. This concerns, in large part, the professional fees incurred and paid by the Liquidating Trust. And it implicates the various orders of the Court that approved professional and other administrative fees. As provided for in the Plan, the Court continued to pass on the propriety of professional fees for services incurred after confirmation. In addition, the Court did not finally approve professional fees for services incurred during the AHF bankruptcy case until well after confirmation. This was done as a way to accommodate the Fifth Circuit's then hindsight test for evaluating professional fees in a bankruptcy case.[16]

The Plan and its provisions are clearly relevant to and implicated by the charges made here. The Trust and its Trustee are products of the Plan; so, too, was the appointment of O'Cheskey as the Liquidating Trustee. By the Plan terms, O'Cheskey was authorized as Liquidating Trustee to exercise the powers of a bankruptcy trustee. The Bankruptcy Code provides both the authority in the Trustee and the source of the causes of action asserted by the Trustee in the 100+ adversary proceedings complained of by the Templeton Group. This factor supports a finding of post-confirmation jurisdiction.

---

[16] *In re Pro-Snax Distribs., Inc.*, 157 F.3d 414, 426 (5th Cir. 1998), *overruled by In re Woerner*, 783 F.3d 266, 268, 276–77 (5th Cir. 2015).

(e) Whether the plan has been substantially consummated and whether state law or bankruptcy law applies

The Plan has been substantially consummated; but bankruptcy jurisdiction does not necessarily end so long as the Plan is not fully consummated. *See U.S. Brass*, 301 F.3d at 305. This factor weighs against bankruptcy jurisdiction. The complaint also raises state law causes of action, which weighs against, but is not dispositive of, post-confirmation jurisdiction. *See Compton v. Walker (In re Coral Petroleum, Inc.)*, 249 B.R. 721, 727–28 (Bankr. S.D. Tex. 2000) ("The jurisdictional statute expressly provides that the applicability of state law to a proceeding is insufficient in itself to render it a non-core proceeding. 28 U.S.C. § 157(b)(3)." (quoting *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999))).

(f) Evidence of forum shopping

The charges raised here by the Templeton Group against the Trustee echo those previously made during the pendency of the AHF bankruptcy case. And they argue now, in support of remand, that "forum shopping by the Trustee is extremely likely given the fact the Trustee was appointed by this Court as the Chapter 11 Trustee coupled with the implicit belief that the Court will act in a manner to justify its appointment of the Chapter 11 Trustee, who now serves as the Liquidating Trustee." *Brief in Support of Plaintiffs' Motion for Remand or Abstention* [Doc. No. 14] ¶ 46. Reurging items that this Court has previously heard and in some instances considered on the merits, and then suggesting that the Court would consider this suit as, in effect, a collateral attack on prior decisions of the Court, is a clear indication that *the Templeton Group* is forum shopping, both by bringing and filing this suit in state court and then seeking remand back to state court.

**B.**

Whether the Proceeding is Core

Concluding that jurisdiction lies here does not end the inquiry, for, in this matter, a determination of mandatory abstention rests on whether the proceeding is core. "Whether a

particular proceeding is core represents a question wholly separate from that of subject-matter jurisdiction." *Resorts*, 372 F.3d at 163 (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d. Cir. 1991)).

A proceeding is core under the statute when it "arise[s] in a bankruptcy case or under Title 11." *Stern v. Marshall*, 131 S. Ct. 2594, 2605 (2011); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). Even when a proceeding is core under the statute, § 157, it must also pass constitutional muster. *Stern*, 131 S. Ct. at 2618.[17] The Supreme Court in *Stern* said that a proceeding is constitutionally core when it "stems from the bankruptcy itself" or when it "would necessarily be resolved in the claims allowance process." *Id.*

The Trustee and Focus argue that the proceeding here is core because it regards a "matter[] concerning the administration of the estate," "confirmation[] of [a] plan[]," and "other proceedings affecting the liquidation of the assets of the estate." 28 U.S.C. § 157(b)(2)(A), (L), (O). The Templeton Group contends that this proceeding is not core because the claims are based on state law and exist outside of the AHF bankruptcy.

Finding core jurisdiction in a proceeding that, in essence, raises malpractice claims against a liquidating trustee is not new. In *Southmark*, the Fifth Circuit addressed bankruptcy jurisdiction in this context. The accountant to a court-appointed examiner was sued by the debtor, Southmark, for failing to appropriately investigate potential causes of action against a third party, which happened to be one of the accountant's biggest clients. *Southmark*, 163 F.3d at 927. Southmark sued the

---

[17] The issue before the Supreme Court in *Stern* was whether the bankruptcy judge had authority to issue a final judgment on a debtor's state law-based claim, which was brought as a counterclaim to a creditor's claim. The Supreme Court held that, despite having clear statutory authority, the bankruptcy judge did not have constitutional authority, because the exercise of such authority violated the principle of the separation of powers embodied in the Constitution. *Id.*

accountant in state court for breach of fiduciary duty and fraud, seeking to recover on the claim it would have had against the third party. *Id.* at 928. The accountant answered the petition and removed the case to the bankruptcy court where the main bankruptcy proceeding was conducted. *Id.* Southmark moved for abstention and remand. *Id.* The bankruptcy court granted a summary judgment motion filed by the accountant and then denied Southmark's motion as moot. On appeal, the district court affirmed the bankruptcy court. On appeal to the Fifth Circuit, the court said the bankruptcy court had erred by not addressing the question of jurisdiction raised by Southmark's motion for abstention and remand, particularly whether the nature of the suit implicated *core* or non-core jurisdiction. *Id.* If it was non-core, then mandatory abstention under 28 U.S.C. § 1334(c) applied. *Id.*

In determining that the proceeding was core, the Fifth Circuit began its analysis by noting that the claims against the court-appointed examiner's accountant were "inseparable from the bankruptcy context." *Id.* at 931. The Fifth Circuit reasoned as follows:

> A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work, conscientiously and cost-effectively.

*Id.* Next, the court stated that "[s]upervising the court-appointed professionals also bears directly on the distribution of the debtor's estate." *Id.* The court was careful to qualify this statement to exclude claims that could stand alone from the bankruptcy. *See id.* The court noted that the claims at issue could not stand alone from the bankruptcy because they involved "the nature of the services performed for the debtor's estate and the fees awarded under superintendence of the bankruptcy court." *Id.*

The Templeton Group contends that *Southmark* is not applicable to this case because it involved purely pre-confirmation conduct, whereas the conduct alleged here occurred after confirmation. In effect, they argue that once the Plan was confirmed the estate ceased to exist and core jurisdiction under § 157(b) is unattainable. Doc. No. 14 ¶¶ 15–16. This argument is misplaced; the conduct alleged here by the Templeton Group is rooted in, and thus *stems* from, the AHF bankruptcy.

That the alleged facts supporting this action arguably spillover or culminate in the period after confirmation does not destroy bankruptcy jurisdiction. In *Coral Petroleum*, the court found *Southmark* applicable to a malpractice action arising from the liquidating trustee's post-confirmation conduct. *Coral Petroleum*, 249 B.R. at 728–30. A liquidating trustee pursued breach of fiduciary duties, gross negligence, and fraud claims against the predecessor liquidating trustee for post-confirmation misconduct. *Id*. at 726. The liquidating trust was established under the plan and consisted of all assets of the bankruptcy estate. *Id.* at 723 and n.5. Like the Templeton Group argues here, the parties that opposed core jurisdiction in *Coral Petroleum* argued that *Southmark* did not apply to post-confirmation conduct. *Id.* at 729. Relying on *Southmark*, the court held that "a bankruptcy court's core jurisdiction extends to professionals and others whom the bankruptcy court appoints." *Id.* at 728 (citing *Southmark*, 163 F.3d at 931). The court addressed the pre- and post-confirmation distinction, noting that a federal court should have authority to "protect the integrity of the judicial process" and that "timing" of the conduct giving rise to the causes should not be a dispositive limitation. *Id*. at 728. The court further noted that "[t]he critical element is that property, which was property of the estate immediately before being turned over to [the liquidating trustee], was turned over to him for distribution to creditors." *Id*. at 730.

Apart from the asserted timing of the actionable conduct, the suit here, as pleaded, is otherwise strikingly similar to *Southmark*. The *Southmark* suit was originally filed in state court,

five years after the bankruptcy case was filed and after its completion. *Southmark* raised state-law causes of action and, apparently, issues of collateral estoppel and res judicata. *Southmark*, 163 F.3d at 928. The line-drawing and labelling by the Templeton Group does not dictate the analysis. As stated by the *Coral Petroleum* court, "the *gravamen* of the *Southmark* decision is that the bankruptcy court has core jurisdiction over matters that are so central to the operation of the bankruptcy case that creditors reasonably rely on the integrity of the federal judicial process to protect them." *Coral Petroleum*, 249 B.R. at 729 (emphasis in original).

The Templeton Group asserts causes for breach of fiduciary duties and negligence as part of a larger scheme on the Trustee's part to discredit Templeton and the others; and they allege that the Trustee prompted or allowed the filing of frivolous lawsuits, resulting in exorbitant fees and expenses, all of which damaged and diminished the bankruptcy estate. As in *Southmark*, the claims at issue here are "inseparable from the bankruptcy context." *See Southmark*, 163 F.3d at 931. Neither party disputes that O'Cheskey was a fiduciary of the Court prior to the confirmation of the Plan. The Plan, *as effectively a joint plan among the parties here*, provided for extensive judicial oversight after confirmation. By submitting to the oversight and authority of the Court, O'Cheskey remained a bona fide bankruptcy fiduciary post-confirmation. *See Coral Petroleum*, 249 B.R. at 730.

The Templeton Group relies on the *WRT* and *Resorts International* decisions. But these cases are distinguishable. In *WRT*, a trustee was sued for causes including breach of contract, breach of fiduciary duties, and gross negligence. *WRT*, 402 B.R. at 721. Unlike the present case, the trust at issue in *WRT* had already terminated prior to the time of the suit against the trustee, and the claims arose from purely post-confirmation conduct. *Id*. at 721, 727. Similarly, the claims in *Resorts International* also arose post-confirmation and concerned a more limited *litigation* trust for

Page 33

the benefit of *certain* creditors. *Resorts Int'l*, 372 F.3d at 157, 163. More important, neither of these decisions implicated the integrity of the bankruptcy process.

The nature of the allegations made against the Trustee and Focus does implicate the integrity of the bankruptcy process; they characterize the Trustee, *from the onset of his appointment*, as, at best, passive and ineffectual, and, at worst, scheming and vindictive. This proceeding arises in the bankruptcy because it concerns alleged misconduct of fiduciaries whose appointments were approved by this Court. The claims do not stand apart from the bankruptcy. *See Southmark*, 163 F.3d at 931. The conduct complained of here, if true, began upon the Trustee's first involvement *in the AHF bankruptcy case*. The conduct of bankruptcy professionals—whether they properly exercised their duties and obligations—goes to the very heart of a bankruptcy case.

This suit can potentially have a profound effect on the allowed creditors of AHF, now trust beneficiaries. The Liquidating Trust has by no means been fully administered; the process of making distributions to allowed claimants is far from complete. This suit will further delay this process. And, given the indemnity provisions of the AHF Plan and the Liquidating Trust Agreement, the remaining estate could be materially less.

## V.

These matters are core matters. The Court will therefore deny the Templeton Group's motion for remand. Contrary to their contention, this ruling does not prejudice the Templeton Group's jury trial right. They retain their Seventh Amendment right to a jury trial (the Court is not here assessing such right); the Court, as a bankruptcy court, cannot conduct a jury trial without consent of all parties. *See* 28 U.S.C. § 157(e).

### End of Memorandum Opinion ###

## ADDENDUM

## STATEMENTS BY TEMPLETON GROUP
## IN AHF BANKRUPTCY CASE

From *Objection of Petitioning Creditors to Application for Order Authorizing Employment of Gardere Wynne Sewell LLP as Co-Counsel to Walter O'Cheskey, Chapter 11 Trustee Effective May 7, 2010* [Doc. No. 1232] at 6, filed by Robert L. Templeton, Paul King, Frances Maddox Estate, Heron Land Company, and others on June 2, 2010:

> **Because the Gardere hourly rates are excessive compared to the rates charged for work performed by experienced attorneys in the Texas Panhandle, the application to employ Gardere should be denied. . . . Gardere does not meet the "disinterested" standard under the Bankruptcy Code.**

Disposition: [Doc. No. 1325] *Interim Order Authorizing Employment of Gardere Wynne Sewell LLP as Co-Counsel to the Chapter 11 Trustee* entered on June 24, 2010, and [Doc. No. 1656] *Memorandum Opinion and Order* [approving Trustee's employment of Gardere Wynne Sewell LLP as co-counsel to Trustee] entered on September 30, 2010.

From *Response of Petitioning Creditors to Trustee's Motion for Continuance of Hearing on Disclosure Statement* [Doc. No. 1292] at 3–4, filed by Robert L. Templeton, Paul King, Frances Maddox Estate, Heron Land Company, and others on June 10, 2010:

> **Many of the creditors were defrauded into investing in AHF on the basis that the life insurance funds would be available to pay their claims in the event of Sterquell Sr.'s demise. Now that fraud is in effect being consummated by the waste of the life insurance proceeds.**
> **. . . .**
> **. . . The Trustee proposes to start draining the life insurance proceeds for the following purposes:**
> **. . . .**
> > **To pay Gardere . . . to take over the handling of litigation at rates nearly $300 per hour higher than the rates of the firm that has successfully recovered $24 million for the Estate so far and has an extensive knowledge of the transactions in issue that will take Gardere . . . six months to duplicate, if in fact it can be duplicated.**

Disposition: [Doc. No. 1359] *Order* [granting Trustee's motion to continue disclosure statement hearing] entered on June 30, 2010.

From *Robert Templeton's, Maddox Estate's, and Heron Land Company's Objection to Trustee's Motion to Continue Hearings on the Disclosure Statements, to Defer Mailing of Competing Plans, and to Request Mediation* [Doc. No. 1602] at 2, 4–6, filed by Robert L. Templeton, Frances Maddox Estate, and Heron Land Company on September 10, 2010 (emphasis in original):

1

> **Every day that this bankruptcy case continues, the estate and all the creditors and parties in interest in this case incur tens of thousands of dollars in attorney fees, *every day*! . . .**
>
> **. . . .**
>
> **. . . The Trustee's attorneys and Focus Management are incurring hundreds of thousands of dollars in fees every month, in addition to the fees being incurred by the many creditors. . . .**
>
> **. . . .**
>
> **. . . The Trustee has now been in charge of this estate for about 120 days. What has the Trustee accomplished?**
>
> - **Filed a plan and disclosure statement which provide for an almost complete liquidation.**
> - **Obtained a liquidation analysis from Focus Management;**
> - **Filed three (3) adversary proceedings to object to the claims of two (2) members of the Unsecured Creditors' Committee, and against David Miller, a former business associate of Robert Templeton.**
> - **Interrupted and interfered with Mullin, Hoard & Brown's efforts to complete settlements and dispose of lawsuits.**
>
> **That is about it.**
>
> **. . . The day after being appointed, Mr. O'Cheskey and Max Tarbox traveled to Dallas to employ Gardere . . . to take over the case. Without investigation, Gardere . . . called for liquidation of the properties. The Trustee has largely turned this bankruptcy over to Gardere . . . who controls Focus Management.**
>
> **. . . .**
>
> **. . . The Trustee fiddles while Rome burns.**
>
> **. . . All these inactions, and all this indecision, only runs up the fees of attorney and accountants. . . .**
>
> **. . . .**
>
> **. . . In addition to the fee interests in this estate which the Trustee and his counsel seek to extract, there are fundamental - and unresolvable - differences which will not be resolved . . . .**

Disposition: [Doc. No. 1628] *Notice of Withdrawal without Prejudice* [of Trustee's motion requesting a continuance of hearings on the disclosure statement] filed by Trustee on September 16, 2010; Trustee's motion was rendered moot by the Court at a hearing held on September 14, 2010.


From *Objection of the Frances Maddox Estate to the Disclosure Statement to Joint Chapter 11 Plan filed by Chapter 11 Trustee and Official Committee of Unsecured Creditors* [Doc. No. 1679] ¶¶ 17, 19, filed by The Frances Maddox Estate on October 8, 2010:

> **[I]t appears obvious that the Gardere Wynne [firm] has "low-balled" its first fee application in order to avoid the "sticker shock" of a complete accounting of the fees and expenses it will seek. . . .**
>
> **. . . .**

> **. . . What are the estimated fees for Max Tarbox, Gardere Wynne and Focus Management? While Focus Management has a rough estimate, there is no explanation of what they would be doing for $45,000 per month. How many millions of dollars in post confirmation fees does Gardere Wynne have in its sights, for what services, and what benefit does Gardere Wynne propose to bring to the estate for these fees? The Court and the creditors are entitled to know this in order to be reasonably informed by this Disclosure.**

Disposition: [Doc. No. 1746] Order Approving Disclosure Statement entered on October 26, 2010; the Court specifically denied the Maddox Estate's objection to the disclosure statement at a hearing on October 21, 2010.


From *Certain Unsecured Creditors' Motion to Vacate U.S. Trustee's Appointment Removing Unsecured Creditors' Committee Member and to Show Cause* [Doc. No. 1753] ¶¶ 19, 23, 25, 46, filed by Robert L. Templeton, Paul King, Frances Maddox Estate, Heron Land Company, and others on October 27, 2010 (emphasis in original):

> **Under the Trustee's Plan, the Trustee's fees would have been much larger, and it appears that the administrative expenses, especially for the Trustee's attorneys, would be very *much* larger than under the . . . Committee's plan. Templeton was leading the creditors objecting to the Trustee's plan.**
> **. . . .**
> **. . . [T]he disagreements between the . . . Committee and the Case Trustee essentially then boiled down to one thing – fees for the Case Trustee and his counsel.**
> **. . . .**
> **. . . Mr. McCartin demanded that the Committee members breach their fiduciary duties to the unsecured creditors in order to "save their own skins."**
> **. . . .**
> **. . . The Trustee's allegations against Mr. Templeton of intentional tax fraud are legally irrelevant, without any legal factual foundation, brought in bad faith, and but for the fact the [*sic*] filed in a judicial proceeding, per se libelous.**

Disposition: At a hearing on January 13, 2011, the Court ruled this motion was rendered moot by plan confirmation.


From *Objection of Robert L. Templeton, Independent Executor of the Frances E. Maddox Estate, to First Interim Fee Application of Gardere Wynne Sewell LLP for Allowance of Fees and Reimbursement of Expenses* [Doc. No. 1789] at 1–4, 7, filed by Robert L. Templeton as Executor for the Frances Maddox Estate on November 8, 2010:

> **The day after the appointment of the Trustee at the behest of Texas Capital Bank ("TCB"), O'Cheskey began the process to employ Gardere. . . . Gardere then quickly shut down the efforts of the Official Unsecured Creditors Committee (the "Committee") and its counsel Mullin Hoard & Brown, LLP, who were well along in the settlement of claims against the estate and the prosecution of a liquidating plan.**

3

. . . Gardere . . . in August, 2010, . . . conceived a scheme to discredit the Committee and several of its individual members so that O'Cheskey could achieve confirmation of a plan. . . . Freedom of Information Act ("FOI") disclosures from the U.S. Trustee reveal in depth the efforts of Gardere to first cast doubt to the U.S. Trustee regarding the intentions of several members of the Committee, which steps were quickly followed by the filing of adversary proceeding complaints by O'Cheskey against three members of the Committee . . . .

. . . On September 14, 2010, McCartin made good use of the scheme to discredit the Committee. . . .

. . . .

. . . McCartin/Gardere and O'Cheskey cast sufficient doubt about the impartiality of the Committee that the naming of O'Cheskey as the proposed post-confirmation liquidating trustee was made a foregone conclusion.

. . . As stated by Robert Templeton and others in pleadings on file with the Court, the claims against the former members of the Committee are false and will be proven to have been false. . . .

. . . The evidence of the scheme to discredit the Committee is unfolding. . . .

. . . With such background in mind, Templeton, to be joined by other creditors, has examined the fees asserted by Gardere in the Application in light of what has and what has not been accomplished, including the millions of dollars that are now being given away to TCB. . . .

. . . Obviously, a tremendous run up in fees and reduced potential return to general unsecured creditors was not the goal of the appointment of a Chapter 11 trustee in this case, but, unfortunately, such is the current path of this case. This is not the action of the Trustee or the Gardere firm, but of Steve McCartin ("McCartin"). This is unworthy conduct by such a talented lawyer to simply keep his position in this case.

. . . .

. . . The fees of $752,317.50 sought in the Application are excessive. . . .

. . . The deposition testimony of O'Cheskey thus far has revealed that O'Cheskey did not review the Application nor Gardere's invoices prior to the filing of the Application. Templeton objects to the Application in that Gardere filed the application without the prior review and approval of the invoices by its client, O'Cheskey. Consequently, the Application should be stricken until such time as O'Cheskey in his estate fiduciary capacity reviews, comments upon, and approves Gardere's invoices.

. . . .

. . . The timing of the commencement and subsequent intensity of Gardere's efforts against members of the Committee coincides with the Committee's plan nearing a disclosure statement hearing and, eventually, confirmation, as discussed above. The Committee's plan would have greatly reduced the need for Gardere's services in this case and thus the fees Gardere could extract from the estate. Beyond the suspicious timing, the litigation against former members of the Committee is frivolous.

4

Disposition: [Doc. No. 1934] *Order Approving First Interim Application of Gardere Wynne Sewell LLP for Allowance of Fees and Reimbursement of Expenses and Authorizing Payment of Such Fees and Expenses from Life Insurance Proceeds Held in the Registry of the Court* entered on December 17, 2010.

From *Frances Maddox Estate's Motion to Compel Completed Videotaped, Oral Deposition of Walter O'Cheskey and First Supplemental Subpoena Duces Tecum* [Doc. No. 1813] ¶¶ 7 and 10, filed by the Frances Maddox Estate on November 15, 2010:

> **O'Cheskey's improper motivation for pursuing the adversary claims is quite relevant to the fee application, the committee, and the plan. . . . Furthermore, the fact that O'Cheskey has done nothing to amend, retract, or withdraw his false pleadings is relevant to the fee application, the committee, and the plan. . . .**
> **. . . .**
> **. . . [A]ny questions regarding O'Cheskey's false claims and improper motives in filing the adversary proceedings are relevant.**

Disposition: [Doc. No. 1851] *Order on Discovery Motions Concerning Plan Confirmation* [limiting the scope of the depositions] entered on November 23, 2010.

From *Objection of Robert L. Templeton, Independent Executor of the Frances E. Maddox Estate, to Confirmation of First Amended Joint Chapter 11 Plan filed by the Trustee and the Official Committee of Unsecured Creditors* [Doc. No. 1831] at 5, 8–15, filed by Robert L. Templeton as Executor for the Frances Maddox Estate on November 19, 2010:

> **As explained in other pleadings filed by Templeton, these factors include, but are not limited to, the means by which the membership of the Committee has been manipulated in order to obtain the Committee's support for the current Plan when the Committee objected to the fees originally sought by O'Cheskey for services as a post-confirmation trustee, TCB's apparent role in ensuring Gardere's retention in this case, and the astronomical fees incurred by Gardere without providing commensurate benefit to the estate.**
> **. . . .**
> **. . . By the Effective Date, these firms will have charged the estate as much as $1.5 million in attorneys fees and expenses, based upon fees disclosed to date. According to the proposed Liquidating Trustee, Gardere and Tarbox will continue to be paid on hourly basis post-effective date.**
> **. . . A dramatic flaw in the Plan, therefore, is that the recovery upon the litigation assets by the Liquidating Trustee is speculative, but the fees charged by Gardere and Tarbox have been demonstrated time and again in this case to be astronomical. The Plan provides insufficient mechanisms (e.g., the fee approval procedures of the Oversight Committee and the limited attorneys' fees budgeted for the Oversight Committee) to protect the corpus of the Liquidating Trust from Gardere and Tarbox extracting fees from the estate if and when their work yields no or limited results.**

**. . . .**
**. . . The Plan is not proposed in good faith in that one of the direct purposes of the Plan is the continued prosecution by the Liquidating Trustee of the soft-money adversary proceedings. . . .**
**. . . The Plan proposes to continue the litigation ad infinitum and spend funds on legal counsel with no apparent end in sight.**
**. . . .**
**. . . In addition to the catch-all jurisdiction reservations in Article XII, the Plan should expressly provide that the Court retains jurisdiction and that Creditors maintain standing to address any issues regarding the Oversight Committee including but not limited to information access and/or dissemination, fees issues, settlements, membership changes to the Oversight Committee, and dissolution of the Oversight Committee.**
**. . . .**
**. . . The Plan should provide that any budgeting and reporting that is to be prepared by the Reorganized Debtor and/or the Liquidating Trust or Trustee that is to be delivered to the Oversight Committee should also be filed with the Court or otherwise disseminated to Creditors without the necessity of the Creditors taking any further action.**
**. . . .**
**. . . Templeton objects to the Liquidating Trust Agreement and the Liquidating Trust provisions in the Plan.**
**. . . Section 7.17 of the Plan permits the Liquidating Trustee to hire any counsel at any time. Considering the rates at which Gardere and Tarbox have duplicated efforts and otherwise incurred fees during the pendency of this case, the Plan should provide that any additional counsel hired by the Liquidating Trustee should be noticed to Creditors for the opportunity to object and to request a hearing.**
**. . . .**
**. . . Post-petition fee statements should be filed with the Court (and thus published through ECF) and not simply distributed to the Oversight Committee. The fees incurred in this case must remain transparent and controlled.**
**. . . .**
**. . . Section 9.09 of the Plan contains a seemingly standard exculpation [*sic*] provisions [*sic*]. Exculpation [*sic*] should not apply in this case to the Trustee and his Professionals. The conduct by the Trustee and/or his Professionals in manipulating the membership of the Committee and in filing baseless adversary proceedings against certain Creditors is the subject of pending litigation that will not be resolved by the time of the Confirmation Hearing. If the targeted Creditors are correct in their theories regarding the manipulation of Committee membership and improper motives for filing groundless litigation, then the Trustee and his Professionals should not be shielded from any potential consequences of having embarked on such actions. At a minimum, any claims or recoveries which could be had by the targeted**

> **Creditors against the Trustee and his Professionals should be carved out and excepted from Section 9.09.**
>
> **. . . The Plan provides too weak of a mechanism for the allowance and payment of the fees and expenses incurred by Gardere and Tarbox as attorneys for the Liquidating Trustee. . . . [A]ll fee requests for post-Effective Date counsel should be filed with the Court and subject to notice and opportunity for hearing.**

Disposition: [Doc. No. 1918] *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* entered on December 8, 2010.[1]

From *Brief in Support of Robert L. Templeton's Motion to Dismiss Trustee's Complaint pursuant to Rule 12(b)(6) and 9(b)* [Adv. No. 10-02016, Doc. No. 8] ¶¶ 21, 26, filed by Robert L. Templeton on October 1, 2010:

> **O'Cheskey's complaint alleges that Templeton entered into agreements with Steve Sterquell, on behalf of American Housing Foundation, to structure transactions in order to take improperly leveraged tax deductions. O'Cheskey alleges that if a transaction is improperly reported to taxing authorities by one party to the transaction, in this instance Templeton, that such incorrectly reported transaction constitutes a fraudulent transfer by the debtor, is voidable, and is not enforceable against the Debtor. O'Cheskey also states that a given tax treatment of a transaction with the debtor states grounds to equitably subordinate Templeton's claims. O'Cheskey cites no authority for these "creative" propositions of law. Templeton believes that these claims are only made with the specific intent to intimidate and defame Templeton and the Official Unsecured Creditors' Committee, while hiding behind the skirts of the judicial proceeding privilege from libel suits.**
>
> **. . . .**
>
> **. . . The Trustee's Complaint is defamatory in nature and meant to damage the reputation of Templeton, and was filed for the bad faith reasons of retaliating against the OUC Committee for opposing the fee demands of the Trustee and his Counsel.**

Disposition: [Adv. No. 10-02016, Doc. No. 31] *Order* [denying Templeton's motion to dismiss complaint] entered on January 14, 2011.

From *Plaintiffs' Complaint to Remove Trustee and to Revoke the Confirmed Plan* [Doc. No. 2670; Adv. No. 11-02123, Doc. No. 1] ¶¶ 17, 28, 30, 32, 33, and 34, filed by Robert L. Templeton, Paul King, and the Frances Maddox Estate on May 27, 2011:

> **Trustee asserted that he would not ever work by the hour, but instead demanded that his compensation include a 3% commission, the maximum**

---

[1] The Second Amended Joint Chapter 11 Plan [Doc. No. 1909] that was ultimately confirmed by the Court was an amendment of the First Amended Joint Chapter 11 Plan [Doc. No. 1747], to which Templeton objected.

under the Bankruptcy Code. The 3% commission demanded by Trustee was to be paid not only from all sums of money recovered and paid by the Trustee, but also sums in the Estate, including the approximately $25,000,000.00 that had already been recovered prior to his appointment and through no effort on his part. That sum of money primarily consisted of the settlement of life insurance proceeds that had been brought about by the petitioning creditors. When the [Unsecured Creditors Committee] realized not just the unreasonable demand of Trustee, but the unbridled and excessive costs being charged by Gardere and Focus, they lost trust in the integrity of the Trustee. It became clear to the [Unsecured Creditors Committee] members that the statements about fiduciary obligations of Trustee were secondary to the greed and to the desire for the money in the registry of the Court.

. . . .

Trustee further represented to the creditors of the estate, including Plaintiffs, each of the following in order to induce the creditors to support the proposal that was eventually confirmed as the Plan, which representations were in fact relied upon by creditors in their decision to support the Plan (fraud in soliciting votes for the Plan):

. . . .

> Representing that the primary reason for Trustee's insistence to pay TCB was because Trustee was bound to pay the approximate $4,500,000.00 to TCB, when in fact, Trustee was not bound to do so. Trustee was represented by Gardere in the TCB matter and there was a relationship between TCB and Gardere that has never been fully disclosed.

> . . . Representing that apartment properties would be promptly listed for sale and liquidated without undue delay, when the Trustee's true intention is to string out the bankruptcy until the maximum is eaten up in excessive fees to Gardere, Focus and others receiving administrative distributions.

> . . . Representing that Trustee would exercise the management and control to be vested in him by the Plan and Liquidating Trust for the benefit of the estate, and therefore, the creditors, when in fact Trustee intended to abandon all management, control and direction to Gardere and Focus.

. . . .

Trustee's intention from the beginning has apparently been to delay the plan process to the detriment of creditors causing, or at least permitting, the administrative costs of the case to rise, primarily in the form of compensation to Trustee, Focus and Trustee's counsel. . . .

. . . .

Trustee and his counsel spent the major part of their time to insure their control of this bankruptcy to obtain the excessive fees they have submitted to attack unsecured creditors. The best example of such conduct lies in the over one hundred adversaries filed on or around April 21, 2011, most, if not all, without any substantial investigation into the merit of the claims asserted.

. . . .

Trustee, while expending Estate resources on defending fee applications and the pursuit of fruitless adversary proceedings, substantially ignored his fiduciary obligation to examine the claims of the various claimants and possible fraudulent transfer claims against third parties. Trustee conducted little if any detailed analysis of the facts, engaged in no cost-benefit analysis, and disregarded Trustee's duties under the Plan and Liquidating Trust with relation to determining whether preference and/or fraudulent transfer claims should have been brought, against whom they should be brought and in what amount they should be brought. The result is that Trustee has filed more than one hundred adversary claims, many of which are likely unnecessary and without merit, when if the Trustee had allocated his resources properly, the Estate would be receiving a benefit rather than extensive litigation costs on claims of unknown merit at best.

. . . Trustee, as a part of his strategy has filed claim objections, actions, adversarial and preference wise as a means to accomplish economic coercion and litigation blackmail. By permitting time to pass without action, Trustee has sought to justify suing everyone at the last minute and then asking for a procedure that effectively transfers the burden to the defendants to prove that any sums received were not a preference or fraudulent transfer. To the extent Trustee has succeeded or will succeed in causing claimants to abandon or to settle claims or settle for less than the amount of their claim, many will be without any justification in law or equity. That strategy may well work on a number of claimants, but is that what a fiduciary is obligated to do? Is not the fiduciary obligated to protect the innocent and lawful claimants? Or is it simply to run up fees and expenses while pommeling [*sic*] the weak only to claim this is a benefit to the estate?

. . . As stated several times by Trustee's counsel, Steve McCartin, the dominant force in this entire strategy is that "we get to fight claimants with their money," and as to the filing of countless objections and adversary proceedings, "we are obligated to file these, whether we think they are justified or not, we just leave it up to the court." McCartin is obviously the agent of the Trustee. The Trustee is responsible for his agents. Is it the purpose of the bankruptcy to burden the Court with merit-less claims or adversary proceedings?

. . . Trustee has a duty to control his agents, to hold them accountable, to know why lawsuits are filed, to know why lawsuits have not been settled and to know what the costs are going to be. . . .

. . . .

The . . . conduct by Trustee supports a conclusion that he is incompetent and is grossly mismanaging the debtor and its estate as both the trustee under the Liquidating Trust and as the Chapter 11 trustee.

Disposition: [Adv. No. 11-02123, Doc. No. 42] *Stipulation and Agreed Order Dismissing Adversary Proceeding* [without prejudice] entered on October 22, 2012.